# UNITED STATES DISTRICT COURT
for the

__WESTERN__ DISTRICT OF __OKLAHOMA__

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
ONE 2010 Cadillac CTS )
VIN: 1G6DV5EP7A0110084 ) Case No M-11-81-CH

## APPLICATION FOR A WARRANT
## TO SEIZE PERSONAL PROPERTY SUBJECT TO FORFEITURE

I, Charles Thumann, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the Western District of Oklahoma is subject to forfeiture to the United States of America under 18 U.S.C. § 981(b) and 21 U.S.C. § 853(e) and (f) *(describe the property)*:

**One 2010 Cadillac CTS, VIN: 1G6DV5EP7A0110084**

The application is based on these facts:

See attached Affidavit of Special Agent Charles Thumann, Federal Bureau of Investigation, which is incorporated by reference herein.

☒ Continued on the attached sheet and made a part hereof.

*Applicant's signature*

Charles Thumann
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: March 31, 2011

*Judge's signature*

City and State: Oklahoma City, Oklahoma    Valerie K. Couch, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

Charles W. Thumann, having been duly sworn, states the following:

1. I am an investigative and law enforcement officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 42 of the United States Code.

2. I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI"), for more than six years. I am currently assigned to the Oklahoma City, Oklahoma Field Office. As an FBI agent, I have participated in several health care fraud investigations, including investigations involving the submission of false and/or fraudulent claims for payment by Medicare. I have also received training in investigating financial crimes, including Medicare and Medicaid fraud.

3. Title 18, United States Code, Section 1347 (Health care fraud) states: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

4. Title 18, United States Code, Section 981(a)(1)(A) (laundering of monetary instruments) states, in part; The following property is subject to forfeiture to the United States:

1



(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

5. Title 18, United States Code, Section 981(C), states, in part; the following property is subject to forfeiture to the United States:

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

6. Title 18, United States Code, Section 1956(c)(7)(F) lists a 'specified unlawful activity' as:

(F) any act or activity constituting an offense involving a Federal health care offense;

7. Title 18, United States Code, Section 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) states;

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

8. The facts and information contained in this Affidavit are based upon my knowledge and observations, information received from other experienced agents of the Department of Health and Human Services - Office of Inspector General, a review of both public and private documents, and interviews of medical doctors and Medicare beneficiaries/patients. This Affidavit is being submitted for the purpose of obtaining

seizure warrants for the following property:

    2009 Dodge Challenger, VIN 2B3LJ74W49H563774

    2010 Chevrolet Camaro, VIN 2G1FK1EJXA9144599

    2008 Chevrolet Van, VIN 1GBFG154181182857

    2010 Cadillac CTS, VIN 1G6DV5EP7A0110084

9. The property specifically set forth in this affidavit is property traceable to specific unlawful activities and therefore subject to seizure and forfeiture by the United States. I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts I believe are necessary to establish probable cause for the issuance of seizure warrants for the mentioned assets.

## Facts and Circumstances
## The Medicare and Medicaid Programs

10. The Medicare Program ("Medicare") is a federal program that provided federal funds to pay for health care benefits for certain individuals, primarily those who are over the age of 65, the blind, and the disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

11. The Medicaid Program ("Medicaid") is a cooperative federal and state program that provides federal and state funds to pay for health care benefits for individuals whose incomes are insufficient to meet the costs of necessary medical expenses. Medicaid is administered federally by CMS. In the state of Oklahoma, Medicaid is administered by the Oklahoma Health Care Authority, a state governmental agency responsible for receiving, reviewing and paying Medicaid claims submitted by health care providers.

12. Medicare and Medicaid are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

13. Individuals who qualified for Medicare or Medicaid benefits are commonly referred to as Medicare or Medicaid "beneficiaries." Each Medicare or Medicaid beneficiary is assigned a unique identification number by each program.



14. Medicare and Medicaid cover certain health care benefits, items, and services, including durable medical equipment ("DME"), that are ordered by licensed medical doctors or other qualified health care providers. DME is equipment that is designed for repeated use and for a medical purpose, such as prosthetic limbs, back braces, knee braces, and wheelchairs.

15. Only individuals and entities who are officially enrolled with Medicare and Medicaid as health care "providers" are permitted to submit claims to Medicare and Medicaid for health care benefits, items, and services furnished to beneficiaries. In order to enroll in the Medicare and Medicaid programs, providers are required to submit applications in which they agree to comply with all Medicare or Medicaid-related laws and regulations. If the programs approve a provider's application, then Medicare and Medicaid assign the provider a unique "provider number" for each program, and the provider then files claims with Medicare or Medicaid to obtain reimbursement for benefits, items, and services rendered to beneficiaries.

16. To receive reimbursement from Medicare or Medicaid, health care providers submit or cause the submission of claims to Medicare or Medicaid for payment for benefits, items, and services provided to beneficiaries. Providers can submit the claims themselves, or use a third-party billing company to do so. Claims can be submitted on paper or by electronic means.

17. Claims submitted by providers to Medicare or Medicaid are received, processed, and paid by companies who contracted with Medicare and Medicaid to provide administrative services.

18. Every claim to Medicare or Medicaid from a provider is required to contain certain information including, but not limited to:

(a) the name and assigned Medicare or Medicaid identification number of the beneficiary to whom the health care benefit, item, or service was provided;



(b) the name and assigned Medicare or Medicaid identification number of the doctor or other qualified health care provider who ordered the health care benefit, item, or service that was the subject of the claim;

(c) the billing code for the health care benefit, item, or service; and

(d) the date upon which the health care benefit, item, or service was provided or supplied to the beneficiary.

19. When claims are submitted to Medicare or Medicaid, the provider certifies that the contents of the form were true, correct, and complete; that the form was prepared in compliance with the laws and regulations governing Medicare or Medicaid; and that the contents of the claim are medically necessary.

20. For beneficiaries who are eligible to receive both Medicare and Medicaid benefits, Medicare is the first payor and Medicaid is the secondary payor of claims. Such claims are referred to as "crossover claims."

21. Medicare typically pays 80% of the cost of durable medical equipment that is ordered by licensed doctors or other licensed, qualified health care providers. For beneficiaries who are eligible to receive both Medicare and Medicaid benefits on a crossover claim, Medicaid pays for the portion of the cost of the DME that Medicare did not cover, typically 20%.

22. Payments by Medicare and Medicaid are often made directly to the DME company rather than to the beneficiary. For this to occur, the beneficiary assigns the right of payment to the DME company. Once such an assignment took place, the DME company assumes the responsibility for submitting claims to and receiving payments from Medicare and Medicaid.

5



**Faulkner and Heartland**

23. Lance E. Faulkner is a resident of Pottawatomie County, Oklahoma, and owned and operated Heartland Orthotic Prosthetic Lab, Inc. d/b/a Faulkner Prosthetic Designs of Oklahoma, LLC, located at 322 West MacArthur Street, Shawnee, Oklahoma, 74804 ("Heartland").

24. Heartland is an Oklahoma business entity purportedly engaged in the business of providing DME, specifically prosthetic limbs and related components. Heartland had Medicare and Medicaid provider numbers and was eligible to receive reimbursement from Medicare and Medicaid for prosthetic limbs and related components that were supplied to beneficiaries.

25. On August 25, 2000, Heartland was incorporated under the laws of Oklahoma. Lance Faulkner was listed as the owner and registered agent of the corporation.

26. On February 19, 2004, Faulkner Prosthetic Designs of Oklahoma LLC was incorporated under the laws of Oklahoma. Lance Faulkner was listed as the owner and registered agent of the corporation

27. On March 16, 2004, a Medicare inspection for re-enrollment confirmed Heartland changed its name and business location from 2806 N. Kickapoo Ave., Shawnee, Oklahoma 74804, to Heartland located at 322 W. MacArthur Street, Shawnee, Oklahoma 74804.

28. From in or about January 2006, and continuing through in or about June 2010, Faulkner, through Heartland, submitted and caused the submission of approximately $8,643,692 in Medicare claims that falsely and fraudulently represented that various health care benefits, items, and services, specifically prosthetic limbs and related components, were prescribed by a doctor and had been provided to Medicare beneficiaries.

29. As a result of the submission of these fraudulent claims to Medicare, Faulkner received Medicare payments to Heartland in the approximate amount of $4,948,699.

6



30. From in or about January 2006, and continuing through in or about June 2010, Faulkner, through Heartland, submitted, and caused the submission of approximately $4,111,912 in Medicaid claims that falsely and fraudulently represented that various health care benefits, items, and services, specifically prosthetic limbs and related components, were prescribed by a doctor and had been provided to Medicaid beneficiaries.

31. As a result of the submission of these fraudulent claims, Faulkner received Medicaid payments to Heartland in the approximate amount of $600,348.

32. On August 24, 2010, affiant interviewed risk manager Denise Zimmerman at the medical center where Dr. Glenn Lytle worked for the past six (6) years and recently resigned. Zimmerman confirmed that Dr. Lytle has not treated three (3) of the nine (9) patients for whom Medicare lists Dr. Lytle as the referring physician. Two (2) of the Heartland patients were previously treated at the medical center by another physician, in 2002 and 2007 respectively, but neither patient was ever prescribed any of the DME allegedly provided by Heartland. From approximately January 2006 through June 2010, Heartland billed Medicare approximately $554,707, and was paid approximately $386,456 by Medicare, for items purportedly prescribed by Dr. Lytle to these five (5) Medicare beneficiaries.

33. On August 18, 2010, affiant interviewed Dr. Ronald Fried. On August 20, 2010, Dr. Fried confirmed he has not treated five (5) of the ten (10) Heartland patients for whom Medicare lists Dr. Fried as the referring physician. Dr. Fried further stated that he never prescribed prosthetic or orthotic equipment for two (2) of the other Heartland patients he did previously treat. From approximately January 2006 through June 2010, Heartland billed Medicare approximately $1,112,002 and was paid approximately $620,358 by Medicare, for items purportedly prescribed by Dr. Fried for the six (6) Medicare beneficiaries.

34. On August 9, 2010, affiant interviewed Dr. Glenn Stow. On August 13, 2010, Dr. Stow's office manager, Sarah Rains, confirmed that Dr. Stow has not treated four (4) of the five (5) Heartland patients for whom Medicare lists Dr. Stow as the

7



referring physician. Raines further advised that Dr. Stow never prescribed prosthetic or orthotic equipment for one (1) Heartland patient he did previously treat in 2007. From approximately January 2006 through June 2010, Heartland billed Medicare approximately $825,010, and was paid approximately $495,625 by Medicare, for items purportedly prescribed by Dr. Stow for these five (5) Medicare beneficiaries.

35. On August 17, 2010, affiant interviewed Dr. Lorraine Wilson. Dr. L.W. confirmed she currently treats one (1) of the two (2) Heartland patients for whom Medicare lists Dr. Wilson as the referring physician. Dr. Wilson has never prescribed this patient any prosthetic or orthotic equipment. From approximately January 2006 through June 2010, Heartland billed Medicare $98,321, and was paid approximately $68,076 by Medicare, for items purportedly prescribed by Dr. Wilson for this Medicare beneficiary.

36. On January 27, 2011, Dr. Angelique Barreto was interviewed. Dr. Barreto confirmed she has not treated any of the four (4) Heartland patients for whom Medicare lists Dr. Barreto as the referring physician. From approximately January 2006 through June 2010, Heartland billed Medicare $521,609 and was paid approximately $301,883 by Medicare, for items purportedly prescribed by Dr. Barreto for these Medicare beneficiaries.

37. On January 28, 2011, Dr. Laura Rankin was interviewed. Dr. Rankin's manager Sheri Cullens confirmed Dr. Rankin has not treated the Heartland patient for whom Medicare lists Dr. Rankin as the referring physician. From approximately January 2006 through June 2010, Heartland billed Medicare $99,121 and was paid approximately $66,152 by Medicare, for items purportedly prescribed by Dr. Rankin for this Medicare beneficiary.

38. On January 27, 2011, Dr. Thuan Pham was interviewed. Dr. Pham confirmed he has not treated the Heartland patient for whom Medicare lists Dr. Pham as the referring physician. From approximately January 2006 through June 2010, Heartland billed Medicare $99,121 and was paid approximately $63,368 by Medicare, for items purportedly prescribed by Dr. Pham for this Medicare beneficiary.

39. On January 28, 2011, Dr. Dennis Roberts was interviewed. Dr. Roberts



confirmed he has not treated the Heartland patient for whom Medicare lists Dr. Roberts as the referring physician. From approximately January 2006 through June 2010, Heartland billed Medicare $24,394 and was paid approximately $13,895 by Medicare, for items purportedly prescribed by Dr. Roberts for this Medicare beneficiary.

40. On August 16, 2010, affiant interviewed Medicare and Medicaid beneficiary Leonette Titus, who received prostheses from Heartland. Titus stated she never received a prescription for her prostheses she received from Heartland, and she has never heard of Dr. Glenn Lytle or Dr. Glenn Stow, two (2) of the (4) prescribing physicians listed for her. Further, Titus never paid any deductibles or co-pay for the prostheses she received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $166,075 to Medicare and Medicaid on behalf of Titus and was reimbursed $117,513 and $29,377 respectively for these claims.

41. On August 16, 2010, affiant interviewed Medicare beneficiary Clarence Hollins, who has not received any prostheses from Heartland. Hollins stated he has been treated by Dr. Wilson, the prescribing physician listed for him, at a dialysis facility. From approximately February 20, 2009 through December 28, 2009, Heartland submitted $98,321 to Medicare on behalf of Hollins and was reimbursed $68,076 for these claims.

42. On August 17, 2010, affiant interviewed Medicare and Medicaid beneficiary George Hill Jr., who received prostheses from Heartland. Hill stated he has never heard of Dr. Glenn Stow, the prescribing physician listed for him. Further, Hill never paid any deductibles or co-pay for the prostheses he received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $275,180 to Medicare and Medicaid on behalf of Hill and was reimbursed $125,097 and $31,274 respectively for these claims.

43. On January, 28, 2011, affiant interviewed Medicare beneficiary Cinda Deason, who received prostheses from Heartland. Deason stated she has never heard of Dr. Angelique Barreto, the prescribing physician listed for her. Further, Deason never paid any deductibles or co-pay for the prostheses she received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $286,783 to

9

Medicare on behalf of Deason and was reimbursed $150,786 for these claims.

44. On January 25, 2011, affiant interviewed Medicare beneficiary Jonathan Grimsley, who received prostheses from Heartland. Grimsley stated he has never heard of Dr. Glenn Lytle, the prescribing physician listed for him. Further, Grimsley never paid any deductibles or co-pay for the prostheses he received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $92,610 to Medicare on behalf of Grimsley and was reimbursed $63,865 for these claims.

45. On January 28, 2011, affiant interviewed Medicare and Medicaid beneficiary Bob Hackworth, who received prostheses from Heartland. Hackworth stated he has never heard of Dr. Richard Helton, Dr. Ronald Fried, Dr. Angelique Barreto, or Dr. Charles Mutch, the prescribing physicians listed for him. Further, Hackworth never paid any deductibles or co-pay for the prostheses he received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $306,938 to Medicare and Medicaid on behalf of Hackworth and was reimbursed $169,203 and $42,301 respectively for these claims.

46. On January 28, 2011, affiant interviewed Medicare beneficiary Gary Lewis, who received prostheses from Heartland. Lewis stated he has never heard of Dr. Ronald Fried, the prescribing physician listed for him. Further, Lewis never paid any deductibles or co-pay for the prostheses he received from Heartland. From approximately January 2006 through June 2010, Heartland submitted $292,471 to Medicare on behalf of Lewis and was reimbursed $63,376 for these claims.

47. On October 19, 2010, affiant interviewed Lance Faulkner. Faulkner stated he started overbilling the Medicare and Medicaid programs in 2006. Faulkner explained that he provided three (3) patients with a prosthesis, billing code L5856, and he submitted these claims to the Medicare and Medicaid programs. Faulkner did not provide any other patients with the proper prosthesis for which Faulkner billed Medicare and Medicaid utilizing billing code L5856. An analysis of the Medicare billing data from January 2006 through June 2010 demonstrated Faulkner submitted claims for 151 units for billing coded L5856.



48. On February 3, 2011, a federal grand jury in the Western District of Oklahoma returned an Indictment charging Lance E. Faulkner with violating Title 18, United States Code, Section 1347, health care fraud. The Indictment further includes forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), for a sum of money equal to $5,549,047.64 representing the amount of proceeds obtained as a result of the offense.

49. Affiant's investigation has revealed that Faulkner's Oklahoma Orthotist/Prosthetist License expired effective September 5, 2010. Thus, Faulkner is currently not permitted to provide orthotic or prosthetic supplies or equipment to patients, and Heartland is not permitted to bill Medicare for supplies or equipment provided after September 5, 2010.

50. Your affiant has identified two (2) Heartland corporate checking accounts but focused on one account, described as follows:

| Financial Institution | Account Name | Account Number | Signature Authority | Affidavit Reference |
|---|---|---|---|---|
| Bison Federal Credit Union | Lance Faulkner Linda Faulkner d/b/a Heartland Orthotic | XXXX9075 | Lance Faulkner Linda Faulkner | BFCU XX8090 |

51. Heartland received payments from Medicare and Medicaid via electronic funds transfer. The electronic funds transfers were directly deposited into Bison Federal Credit Union account number XXXXX9075, in the name Heartland, for which Faulkner and his spouse, Linda Faulkner, are the only authorized signors on the account. Your affiant analyzed this financial account from January 2008 through September 2010. The financial analysis shows Cigna Government, CMS Medicare, and Medicaid deposited funds from via electronic funds transfer into Bison Federal Credit Union account BFCU XX8090.

52. A financial analysis of the bank records for Heartland was conducted. The

Heartland account analyzed is maintained at Bison Federal Credit Union account number XXXXX9075. The analysis revealed that Cigna Government, CMS Medicare, Medicaid represent the significant customers of Heartland dealing with Medicare and Medicaid patients. To date, the review of bank account statements for Heartland reflects deposits of more than $3.2M during the period January 2008 to September 2010. Further, the funds deposited from Medicare and Medicaid customers were then traced to certain expenditures for vehicles purchased by the Faulkner's. The following table details the Heartland deposits to BFCU XX8090 from significant customers as follows:

| *Deposit Source* | *Amount* |
|---|---|
| Ada Artificial Limb & Brace | $ 277,495.52 |
| Blue Cross Blue Shield of Oklahoma | $ 33,046.94 |
| CIGNA Government | $1,744,139.91 |
| CMS Medicare | $1,230,067.04 |
| Lance Faulkner | $ 28,503.13 |
| Medicaid | $ 324,372.07 |
| *TOTALS* | *$3,637,624.61* |

53.   Further, the analysis shows both Lance and Linda Faulkner caused withdrawals from the corporate checking account to purchase the following described assets.

### 2009 Dodge Challenger
### VIN 2B3LJ74W49H563774

54.   Based on records provided by David Stanley Dodge, 7609 S.E. 29th, Midwest City, Oklahoma 73110 it was determined that on April 6, 2009 Lance and Linda Faulkner purchased a 2009 Dodge Challenger, VIN 2B3LJ74W49H563774 for a total sales price of $47,406.00. Faulkner traded in a 2006 Dodge Charger, VIN

12

2B3KA53H26H214854 and received a trade in allowance of $12,961.00, leaving a trade balance owed of $34,445.00. Faulkner added accessories, paid a processing fee and added an extended service contract bringing the balance owed to $37,088.00. The remaining balance of $37,088.00 was paid with BFCU cashier's check number 89804, in full satisfaction for the 2009 Dodge Challenger, VIN 2B3LJ74W49H563774.

55. The investigation had no financial records for the time period prior to January 1, 2008 and as a result was not able to determine the source of funds used to purchase the 2006 Dodge Charger traded in.

56. Affiant's analysis of BFCU account number XX8090 of Heartland shows Faulkner made a withdrawal on April 6, 2009 totaling $37,088.00 from Heartland BFCU account number XX8090, to purchase BFCU cashier's check #89804 payable to David Stanley for payment in full for the 2009 Dodge Challenger, VIN 2B3LJ74W49H563774. These funds are traceable proceeds from the underlying criminal activity of false and fraudulent claims to Medicare and Medicaid described above.

57. The Oklahoma certificate of title shows the 2009 Dodge Challenger is registered to Linda and/or Lance Faulkner.

## 2010 Chevrolet Camaro
## VIN 2G1FK1EJXA9144599

58. Based on records provided by Bob Moore Cadillac 13000 N. Broadway Extension, OKC 73114 it was determined that on October 2, 2009 Lance Faulkner and Linda Faulkner purchased a 2010 Chevrolet Camaro, VIN 2G1FK1EJXA9144599 for a total sales price of $56,485.00. The Chevrolet Camaro was purchased from Bob Moore Cadillac. Faulkner traded in a 2003 Hummer H2 and received a trade in allowance of $15,000.00, leaving a balance owed of $42,283.00. The remaining balance of $42,283.00, including a dent zone fee of $499.00 was paid with three BFCU cashier's checks (#91645, #91683, and #91732) in full satisfaction for the 2010 Chevrolet Camaro, VIN 2G1FK1EJXA9144599.



59. Affiant's analysis of BFCU account number XX8090 of Heartland shows Faulkner made three withdrawals during October 2010 totaling $42,283.00 from Heartland BFCU account number XX8090, to purchase three BFCU cashier's checks (#91645, #91683, and #91732) in the respective amounts of $15,000.00, $22,000.00 and $5,283.00 in full payment to Bob Moore for the 2010 Chevrolet Camaro, VIN 2G1FK1EJXA9144599. These funds are traceable proceeds from the underlying criminal activity of false and fraudulent claims to Medicare and Medicaid described above.

60. The Oklahoma certificate of title shows the 2010 Chevrolet Camaro, is registered to Lance or Linda Faulkner.

## 2008 Chevrolet Van
## VIN #1GBFG154181182857

61. Based on records provided by Bob Moore Cadillac, 13000 N. Broadway Extension, OKC 73114 it was determined that on ~~November 3,~~ June 8, 2009 Lance Faulkner purchased a 2008 Chevrolet Van, VIN 1GBFG154181182857 for a total sales price of $46,584.00, including a dent zone fee of $499.50. The Chevrolet Van was purchased from Bob Moore Cadillac. The balance of $46,584.00 was paid with three BFCU cashier's checks purchased by debit withdrawals from Heartland account number XX8090 and one cash payment, in full satisfaction for the 2008 Chevrolet Van VIN 1GBFG154181182857.

62. Affiant's analysis of BFCU account number XX8090 of Heartland shows Faulkner made three withdrawals during June 2009 totaling $50,500.00 from Heartland account number XX8090, to purchase three BFCU cashier's checks (#90122, #90404, and #90529) in the respective amounts of $2,000.00, $39,500.00, and $9,000.00, to pay Bob Moore for the 2008 Chevrolet Van, VIN 1GBFG154181182857. Also, on June 19, 2009, Faulkner delivered cash payment of $2,000.00 toward the purchase of this vehicle. These funds are traceable proceeds from the underlying criminal activity of false and fraudulent claims to Medicare and Medicaid described above.



63. It should be noted that Faulkner overpaid the purchase price of the Chevrolet van based on the records provided by Bob Moore Cadillac. Faulkner paid for a protection plan on the 2009 Challenger through Bob Moore Cadillac, even though the Challenger was purchased from David Stanley.

64. The Oklahoma certificate of title shows the 2008 Chevrolet Van is registered to Lance E. Faulkner or Linda M. Faulkner.

## 2010 Cadillac CTS
## VIN 1G6DV5EP7A0110084

65. Based on records provided by Bob Moore Cadillac 13000 N. Broadway Extension, OKC 73114 it was determined that on November 3, 2009 Lance Faulkner purchased a 2010 Cadillac, VIN 1G6DV5EP7A0110084 for a total sales price of $72,502.88. The Cadillac was purchased from Bob Moore Cadillac. Faulkner traded in a 2009 Cadillac CTS, VIN 1G6DN57P390162112 with a trade in allowance of $45,000.00. Faulkner added a dent zone fee of $499.00, which left a balance owed of $28,001.88. After Faulkner paid a $4,501.88 cash down payment, it left a balance owed of $23,500.00. The remaining balance of $23,500.00 was paid on November 2, 2009 with BFCU cashier's check number 91982 in full satisfaction for the 2010 Cadillac CTS, VIN 1G6DV5EP7A0110084.

66. Affiant's analysis of BFCU account number XX8090 of Heartland shows Faulkner made three withdrawals in April 2009 totaling $46,101.00 from Heartland account number XX8090, to purchase three BFCU cashier's checks (#89729, #89793, and #89937) in the respective amounts of $37,500.00, $7,111.00 and $1,490.00 to pay Bob Moore for the 2009 Cadillac CTS, VIN 1G6DN57P390162112 traded in. These funds are traceable proceeds from the underlying criminal activity of false and fraudulent claims to Medicare/Medicaid described above.

67. Further, Affiant's analysis of BFCU account number XX8090 of Heartland shows on November 2, 2009 Faulkner withdrew $23,500.00 from Heartland account number XX8090, to purchase BFCU cashier's check number 91982 as payment in full to

15



Bob Moore for the 2010 Cadillac CTS, VIN 1G6DV5EP7A0110084. These funds are traceable proceeds from the underlying criminal activity of false and fraudulent claims to Medicare and Medicaid described above. The Oklahoma certificate of title shows the 2010 Cadillac CTS, VIN 1G6DV5EP7A0110084 is registered to Lance Faulkner.

68. Based upon the facts and circumstances described above, your Affiant believes there is probable cause to believe that Heartland, through Faulkner, committed health care fraud, in violation of Title 18, United States Code, Section 1347; and submitted and caused to be submitted false claims to Medicare, in violation of Title 18, United States Code, Section 287.

## Conclusion

69. Based upon the foregoing, I respectfully submit that there is probable cause to believe that Heartland, through Faulkner, committed violations of Title 18, United States Code, Sections 1347 and 287, through the submission of false and fraudulent claims to the Medicare and Medicaid Programs. Proceeds of this fraud activity were utilized to purchase the above vehicles and they represent proceeds of 'specified unlawful activity' and are therefore subject to seizure and forfeiture to the United States under Title 18, United States Code, Section 981. Your affiant submits this affidavit in support of seizure warrants for the following property:

    2009 Dodge Challenger, VIN 2B3LJ74W49H563774
    2010 Chevrolet Camaro, VIN 2G1FK1EJXA9144599
    2008 Chevrolet Van, VIN 1GBFG154181182857
    2010 Cadillac CTS, VIN 1G6DV5EP7A0110084



Further Your Affiant Sayeth Not.

_____
Charles W. Thumann
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 31st day of March 2011, at Oklahoma City, Oklahoma.

_____
VALERIE K. COUCH
United States Magistrate Judge

17